USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/11/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
　　　　　　　　　　　　　　　　　　　　　　　:

BENNIE GIBSON,
　　　　　　　　　　　　　　　　　　　　　　　:　　**OPINION AND ORDER**

　　　　　　　　Plaintiff,
　　　　　　　　　　　　　　　　　　　　　　　:　　　04 Civ. 4350 (SAS)

　　　　　- against -
　　　　　　　　　　　　　　　　　　　　　　　:

COMMISSIONER OF MENTAL
HEALTH; EXECUTIVE ADMINISTRATOR　:
HOLANCHOK; RICHARD BENNETT;
PEGGY HEALY; COUNTY OF ORANGE;　　:
TOWN OF NEW HAMPTON; GOVERNOR
PATAKI; MR. CADETT and other treatment　:
assistants responding to incident at
Mid-Hudson Psychiatric in February or　　:
March 2003; MICHAEL MARCH;
MR. CATIZONE; an unknown female　　　:
investigator from Risk Management or
unknown unit affiliated with Mid-Hudson;　:
DR. BAI or BEY at Mid-Hudson,
　　　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　Defendants.
------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

　　　　Plaintiff Bennie Gibson, a former patient at Mid-Hudson Forensic

Psychiatric Center ("Mid-Hudson"), brings this pro se action pursuant to section

1983, title 42 of the United States Code ("section 1983"). The gravamen of his

action stems from an alleged assault Gibson received at the hands of two Mid-

1

Hudson employees, Secure Hospital Treatment Assistants ("SHTAs")[1] Thomas

Catizone and Michael March. Plaintiff alleges that he was unlawfully restrained

for a nine-day period immediately following this incident. Plaintiff also alleges

destruction of his legal papers, retaliation/harassment, and failure to investigate on

the part of defendants County of Orange and Town of New Hampton (hereinafter

"County defendants").

The "State defendants"[2] – comprised of the Commissioner of the

New York State Office of Mental Health ("Commissioner"), Howard Holanchock,

Peggi Healy, Dr. Young Bae, and Thomas Catizone – move for partial summary

judgment on the ground that they were not personally involved in the

constitutional violations alleged by plaintiff. In particular, the State defendants

---

[1] SHTAs are non-managerial employees who assist patients in their daily living activities and monitor their safety. *See* Memorandum of Law in Support of the State Defendants' Motion for Partial Summary Judgment ("State Def. Mem.") at 1 n.1.

[2] The State defendants are represented by the Attorney General for the State of New York. The Attorney General does not represent Michael March whom plaintiff admits has not yet been served. *See* Affidavit in Support of Motion Pursuant to Fed. R. Civ. Proc. Rule 56 of Wright-Miller-Marcus-Kane in Opposition to Summary Judgment Fed. R. Civ. Rule 56(D)(1)(a)(2)(e)(2)(f)(g) ("Pl. Opp.") at 17 ("March . . . has not been served, nor found as of yet to testify, which is not to say plaintiff did not try to serve US Marshall [sic]."). In addition, Richard Bennett was the former Executive Director at Mid-Hudson whose tenure ended before plaintiff's lawsuit was commenced. Because Bennett has not been served, he is no longer a defendant in this action.

argue that all claims against the Commissioner, Holanchok, and Healy should be dismissed because there is no evidence that these defendants were personally involved in any of the alleged wrongdoing. The State defendants further argue that plaintiff's claim relating to the destruction of his legal papers and his harassment/retaliation claim should be dismissed against Catizone and Dr. Bae for lack of personal involvement.

The County defendants also move for summary judgment dismissing plaintiff's failure to investigate claim on the following grounds: failure to establish a municipal policy or practice of ignoring patient complaints of abuse at Mid-Hudson; lack of proximate cause between any alleged policy or practice and plaintiff's injuries; and failure to establish that the County defendants had a legal obligation to protect plaintiff from abuse at Mid-Hudson. Both motions for summary judgment are granted.[3]

## I.    FACTS

### A.    Statutory and Regulatory Framework: Patient Safety

The Office of Mental Health ("OMH"), an office within the New York State Department of Mental Hygiene, is responsible for ensuring that persons

---

[3]    Accordingly, the only remaining claims are those against Catizone based on the alleged assault and against Dr. Bae based on the alleged restraint.

with mental illness receive care, treatment and rehabilitation and that their personal and civil rights are protected.[4] Patients in OMH hospitals are entitled to care and treatment that is suited to their needs and administered with respect for their dignity and personal integrity.[5] Numerous psychiatric hospitals have been established within OMH to provide such care.[6] One such facility is Mid-Hudson, a secure adult forensic psychiatric hospital within OMH that provides evaluation, treatment, and rehabilitation for patients admitted primarily pursuant to a court order.[7]

The Commissioner has adopted regulations to enhance the quality of care and protect the health and safety of persons admitted to OMH hospitals.[8] Each person residing in an OMH hospital has the right to a safe and sanitary environment free from abuse and mistreatment by employees or other residents.[9] In addition, each hospital must establish and maintain an incident management

---

[4]     *See* N.Y. Mental Hygiene Law ("MHL") §§ 5.01 & 7.07( c).

[5]     *See id.* § 33.03(a).

[6]     *See id.* § 7.17(b).

[7]     *See id.*

[8]     *See, e.g.,* 14 NYCRR §§ 524.1 - 524.9 & 527.1 - 527.12.

[9]     *See id.* § 527.5(b)(1) & (5).

4

program, the purpose of which is to ensure that allegations of abuse are reported and investigated, and that appropriate corrective and preventive actions are identified and taken.[10]

Mid-Hudson has an Executive Director, appointed by the Commissioner, who acts as its Chief Executive Officer.[11] The Executive Director is responsible for the overall operation and management of Mid-Hudson and for ensuring that patients at Mid-Hudson are treated humanely.[12] The MHL mandates that the Executive Director "shall investigate every case of alleged patient abuse or mistreatment."[13] The Executive Director, however, does not personally supervise SHTAs, nurses, psychiatrists, or other staff members who work on the wards with patients.

In accordance with the MHL, Mid-Hudson has a Clinical Risk Management Policy (the "Policy"), the purpose of which is to protect the health and safety of patients by ensuring that allegations of patient abuse are investigated

---

[10] *See id.* § 524.1 *et seq.*

[11] *See* MHL § 7.21.

[12] *See id.* § 7.21(a) & (b).

[13] *Id.* § 7.21(b).

5

and that corrective action is taken, if necessary.[14]   Under the Policy, all allegations of physical and psychological abuse must be investigated.[15]   Allegations concerning serious incidents, such as allegations of physical or psychological abuse, are investigated by a risk management specialist or the Risk Manager, who supervises the risk management specialists.[16]   The Risk Manager and risk management specialists are Mid-Hudson staff members experienced in clinical, administrative, information-management and performance-improvement areas who have received formal training in basic and advanced investigation techniques.[17]   Allegations concerning less serious incidents, such as property loss or damage which do not involve physical injury, may be investigated by a staff member with supervisory authority such as a Unit Chief.[18]

Whether the investigation concerns a minor or serious incident, the investigator interviews persons who may have information about the incident, and

[14]   *See* 5/12/08 Affidavit of Lynn Spuler, Clinical Risk Manager at Mid-Hudson, in Support of the State Defendants' Motion for Partial Summary Judgment ("Spuler Aff.") ¶ 4 & Ex. A (Mid-Hudson Policy & Procedure Manual).

[15]   *See id.* ¶ 5.

[16]   *See id.*

[17]   *See id.*

[18]   *See id.* ¶ 6 (a unit consists of six wards for which the Unit Chief has overall supervisory responsibility).

6

reviews relevant medical records or other documents.[19] The investigator may find that an allegation is substantiated, unsubstantiated, or inconclusive.[20] A finding of substantiated means the allegation is supported by the evidence. A finding of unsubstantiated means the allegation is not supported by the evidence. A finding of inconclusive means that the evidence is contradictory and a determination cannot be made.[21]

When the Risk Manager or a risk management specialist completes an investigation into a more serious incident, the investigator reports his or her findings to the Executive Director and the Incident Review Committee ("IRC").[22] The IRC is a committee consisting of the Executive Director and other designated administrators and employees, the purpose of which is to review the investigation to ensure that any appropriate corrective action has been identified.[23] If, after investigation, an allegation of abuse is substantiated then, in general, disciplinary

---

[19] *See id.* ¶ 7.

[20] *See id.* ¶ 8.

[21] *See id.*

[22] *See id.* ¶ 10.

[23] *See id.* ¶ 11.

action is instituted.[24] The disciplinary action can range from a loss of pay to suspension or termination.[25]    If an allegation is unsubstantiated or inconclusive, no disciplinary action is taken, although staff may be counseled concerning following proper procedures and policies, additional staff training may be conducted, and policies or procedures may be examined and changed, if necessary.[26]

## B.    Statutory and Regulatory Framework: Use of Restraint

In accordance with the goal of ensuring humane, quality care, state law restricts the use of restraint, which is defined as the use of any apparatus which prevents the free movement of both arms or legs or which immobilizes a patient, and which the patient is unable to remove easily.[27]  Restraint may be used only when necessary to prevent a patient from seriously injuring himself or others.[28]  In addition, restraint may be used only if less restrictive methods have been clinically determined to be inappropriate or insufficient to avoid injury and

---

[24]  *See id.* ¶ 12.

[25]  *See id.*

[26]  *See id.* ¶ 13.

[27]  *See* MHL § 33.04(a).

[28]  *See id.* § 33.04(a) & (b).

8

may not be used as punishment or for the convenience of staff.[29] An assessment of the patient's condition must be made every thirty minutes.[30] A patient in restraint must be released from restraint at least every two hours, except when asleep.[31] Furthermore, upon being released from restraint, if a patient makes no overt gestures threatening serious harm or injury to himself or others a restraint may not be reimposed unless a physician determines, in his or her professional judgment, that release would be harmful to the patient or others.[32]

The Commissioner has adopted regulations regarding the use of restraint. Under these regulations, restraint may be used only when absolutely necessary, and only as long as necessary, to protect the patient from injuring himself or others.[33] The maximum period in which a patient may be kept continuously in restraint is two hours, except when asleep, and orders for restraint must be rewritten daily.[34] In addition to these regulations, the Commissioner has

---

[29] *See id.* § 33.04(b).

[30] *See id.* § 33.04(f).

[31] *See id.*

[32] *See id.*

[33] *See* 14 NYCRR § 27.7(a)(1) & (4).

[34] *See id.* § 27.7(c)(3).

9

promulgated an official OMH policy further regulating the use of restraint.[35] The

Restraint Policy provides that the implementation of restraint must be pursuant to

a physician's written order.[36] The maximum time period for such orders is two

hours for adults, subject to renewal as needed.[37] The use of restraint beyond a

continuous eight-hour period requires written approval by the facility's clinical

director.[38] Continuous use of restraint beyond twenty-four hours requires that the

OMH's Chief Medical Officer be notified.[39]

### C.   Plaintiff's Allegations

Gibson has been admitted to Mid-Hudson numerous times in the

past.[40] On March 3, 2003, during his fifth visit to Mid-Hudson, he was diagnosed

---

[35]   See 5/14/08 Affidavit of Susan Watson, administrative assistant in the Bureau of Policy, Regulation and Legislation in the OMH Office of Counsel, in Support of the State Defendants' Motion for Summary Judgment ¶ 7 & Ex. A (OMH Official Policy Manual: Seclusion and Restraint, hereinafter "Restraint Policy").

[36]   *See* Restraint Policy § E(2)(a).

[37]   *See id.* §§ E(2)(f)(i) & E(3)(g)(ii).

[38]   *See id.* § E(2)(i)(i).

[39]   *See id.*

[40]   *See* Inpatient Screening Admission Note - Psychiatric Evaluation Part II, Ex. G to the 5/19/08 Declaration of Laura Wong-Pan, Senior Assistant County Attorney for defendants Town of New Hampton and County of Orange ("Wong-Pan Decl."), ¶ 1.A ("According to his records, he was first admitted to [Mid-

with the following: Delusional Disorder 297.1; Cocaine Abuse 305.60; and

Adjustment Disorder with Disturbance of Conduct 309.3.[41] On several occasions,

plaintiff has been arrested for "auto stripping," found incompetent to stand trial by

a criminal court, and then sent to a psychiatric hospital.[42] Plaintiff, however, does

not believe that he is mentally ill.[43]

In his Second Amended Complaint, plaintiff alleges that in January or

February 2003, while he was committed to Mid-Hudson pursuant to court order,

SHTA Thomas Catizone and SHTA Michael March assaulted him.[44] As a result of

this alleged attack, Gibson allegedly sustained injuries including: a swollen and

bloodied face; bruised, cut and swollen eyes; soreness and pain around his back,

---

Hudson] for the same problems from 01/22/02 to 03/03/02, his second admission
was from 03/25/02 to 06/19/02, third from 10/23/02 to 01/29/03 under 730.50
commitment Order. This is [his] fifth admission to this facility.").

[41] *See id.* ¶ 3.

[42] *See* Deposition of Bennie Gibson, dated August 14, 2007, Ex. A to the
Declaration of Michael E. Peeples, Assistant Attorney General, in Support of the
State Defendants' Motion for Partial Summary Judgment ("Gibson Dep.") at 35-
38.

[43] *See id.* at 40.

[44] *See* Second Amended Complaint dated October 12, 2005 ("Am. Cmpl."),
Ex. A to the Wong-Pan Decl., Section IV. Statement of Claim ¶¶ 13 & 17. At his
deposition, Gibson agreed that the incident took place on March 8, 2003. *See*
Gibson Dep. at 178.

neck, chest and sides; and a swollen jaw that made eating difficult.[45]

A risk management specialist at Mid-Hudson investigated this incident by interviewing plaintiff, patients, and staff members, and reviewing relevant hospital records.[46] The risk management specialist found the allegation to be inconclusive.[47] Because the finding was inconclusive, the IRC did not recommend disciplinary action.[48] SHTA Catizone denies ever having struck, kicked or assaulted plaintiff.[49] According to Catizone, it was Gibson who first struck SHTA March while being escorted down the hall by March and Catizone after screaming insults and curses at Catizone and other SHTAs.[50] The three then fell to the floor where Catizone and March restrained Gibson, who continued to

---

[45] *See* Am. Cmpl. ¶ 22.

[46] *See* Spuler Aff. ¶ 14 & Ex. B (Confidential Memorandum dated May 21, 2003 from Sharon Henry, Risk Management Specialist, to Richard Bennett, Executive Director).

[47] *See id.*

[48] *See id.*

[49] *See* 5/16/08 Affidavit of Thomas Catizone in Support of the State Defendants' Motion for Partial Summary Judgment ("Catizone Aff.") ¶ 3.

[50] *See id.* ¶¶ 4-5.

struggle and scream.[51]

In addition, Gibson alleges that Dr. Bae, a former staff psychiatrist at Mid-Hudson, kept him in wrist-to-waist restraints following the incident.[52] Gibson contends that shortly after the March 8, 2003 incident, he was put in a leather restraint with his arms placed in front of him.[53] Dr. Bae, Gibson's former treating psychiatrist, allegedly refused Gibson's request to have the restraint removed.[54] Gibson claims he was kept in restraint for nine days.[55]

Contemporaneous medical records, including physician' orders and restraint monitoring forms, indicate that Gibson was placed in a wrist-to-belt velcro restraint at approximately 9:00 p.m. on March 8, 2003,[56] and released from

---

[51] *See id.* ¶ 5. Whether Gibson or March and/or Catizone first initiated physical contact raises a material question of fact. Accordingly, Catizone has not moved for summary judgment with respect to Gibson's assault claim.

[52] *See* Am. Cmpl. ¶ 24.

[53] *See* Gibson Dep. at 70.

[54] *See id.* at 71.

[55] *See id.*

[56] *See* Restrain or Seclusion Monitoring Form, Ex. A to the 5/13/08 Affidavit of Barbara Forrester, Health Information Management Administrator at Creedmoor Psychiatric Center, in Support of the State Defendants' Motion for Partial Summary Judgment ("Forrester Aff.").

that restraint at approximately 11:00 p.m. on March 8, 2003.[57] Moreover,

Catizone claims that he saw Gibson throughout the day on March 9, 2003, and that

he was not restrained at any time that day.[58] Given this conflicting evidence, the

period of time Gibson remained in restraint poses a material issue of fact, thereby

precluding summary judgment as to Dr. Bae on this claim.

Gibson also claims that one year after the alleged assault and

restraint, his legal papers were thrown in the toilet and shower and urinated upon

by unknown Mid-Hudson staff members.[59] Gibson asserts that in May or June

2004, legal papers concerning his criminal case, such as motions, letters to the

court, and writs were found urinated upon in the toilet and shower.[60] Gibson did

not see who threw these papers in the toilet and shower.[61] However, he reported

the incident to a Mental Hygiene Legal Services ("MHLS") attorney, who reported

it to Warren Skov, a Unit Chief at Mid-Hudson responsible for ward 43/44,

---

[57] *See* Restraint or Seclusion Termination Note, Ex. D to the Forrester Aff.

[58] *See* Catizone Aff. ¶ 7.

[59] *See* Am. Cmpl., Amended Issues or Supplemental Issues, ¶ 1.

[60] *See* Gibson Dep. at 125, 131.

[61] *See id.* at 126.

**14**

building 4, the ward where Gibson resided.[62]

Skov investigated this incident by viewing the papers and, interviewing patients and staff members.[63] Because no one admitted throwing the papers in the toilet and shower and there were no witnesses to this event, Skov was unable to identify the person(s) responsible.[64] Skov therefore found that the allegation was inconclusive.[65] However, Skov discussed his findings with Lynn Spuler, the Risk Manager at Mid-Hudson.[66] Spuler determined that because the responsible party could not be identified, further investigation was unwarranted.[67] Nevertheless, Skov counseled staff members that they should promptly document and report similar incidents in the future.[68]

---

[62] *See* 5/8/08 Affidavit of Warren Skov, Chief of Services at Mid-Hudson, in Support of the State Defendants' Motion for Partial Summary Judgment ("Skov Aff.") ¶ 9.

[63] *See id.* ¶ 10.

[64] *See id.*

[65] *See id.*

[66] *See id.* ¶ 12.

[67] *See* Spuler Aff. ¶ 16.

[68] *See* Skov Aff. ¶ 13.

**15**

Gibson further alleges that one year after his legal papers were destroyed, he was harassed and retaliated against by certain Mid-Hudson employees, not named as defendants herein, because he testified against a staff member on behalf of a Mid-Hudson patient.[69] Former Mid-Hudson Executive Director Holanchock received a memorandum from an MHLS attorney stating that various Mid-Hudson staff members had made intimidating and threatening statements to Gibson in retaliation for his testimony in a patient abuse criminal case.[70] The remedy sought by Gibson was transfer to another building.[71]

To ensure that Gibson had no contact with the offending staff members, Holanchock directed that Gibson be transferred from ward 43/44, building 4, to another ward in a different building.[72] On April 20, 2005, Gibson was transferred from ward 43/44, building 4, to ward 3, building 3.[73] At the recommendation of a risk management specialist, Gibson remained on his new

---

[69] *See* Am. Cmpl., ¶¶ 2 & 3.

[70] *See* Affidavit of Howard Holanchock in Support of the State Defendants' Motion for Partial Summary Judgment ("Holanchock Aff.") ¶ 5 & Ex. A (4/19/05 Memorandum from Marga L. Gordon, Esq. to Holanchock).

[71] *See id.*

[72] *See id.* ¶ 6.

[73] *See* Skov Aff. ¶ 15.

16

ward, at building 3, ward 3, and did not return to ward 43/44, building 4.[74]

Finally, Gibson alleges that the County defendants violated his civil

rights by failing to initiate an investigation after receiving complaints of abuse by

Mid-Hudson patients.[75] The only allegation against the County defendants

appears at paragraph 28 of the Second Amended Complaint, which states:

> County of orange & towen odf (sic) new hampton are
> constantly called or written to by patients I myself on abuse
> at Mid Hudson no investigation has been commenced by
> these agencies although several local newspaper article
> talked of violence.[76]

The County defendants served discovery demands on plaintiff including a Demand

for Interrogatories[77] and a Demand for Production of Documents.[78] The County

defendants sought the identity of all witnesses with knowledge of the allegations

contained in the above paragraph and a list of all documents supporting the

allegations against the County defendants.[79]

---

[74] *See id.*

[75] *See* Am. Cmpl., Section IV, ¶ 28.

[76] *Id.*

[77] *See* Ex. C to the Wong-Pan Decl.

[78] *See* Ex. D to the Wong-Pan Decl..

[79] *See* Ex. C to the Wong-Pan Decl. at 4.

17

In his October 30, 2006 response to the request for interrogatories,

Gibson did not list a single witness to the allegations contained in paragraph 28,

nor did he list any documents which supported those allegations.[80] Gibson did

provide a list of telephone calls he made, but none of the entities on his list were

representatives or employees of the Orange County government.[81] In its demand

for the production of documents, the County defendants requested: "All

documents, including but not limited to, letters, memoranda, notes, complaints,

and newspaper articles, relating to Plaintiff's allegation at fact 28 of the

Complaint."[82] Plaintiff did not produce a single document in response to this

demand. In his response to the County defendants' demand for the production of

documents, Gibson responded as follows:

> concerning Fact 28 (Local Orange County Newspaper)
> The Record carried several articles of violence at Mid
> Hudson Psych. I do not have fact 28 before me at said
> time. Will get back in touch, but I believe, this may be the
> reference of. Government does have record of Mid
> Hudson Psych workers striking for higher wages due to

---

[80] *See* Notice of Response to Demand For Interrogatories, Ex. E to the Wong-Pan Decl.

[81] *See* Affidavit of Bennie Gibson in Support of Response for Interrogatories, Ex. E to the Wong-Pan Decl., ¶ 6.

[82] *See* Demand for Production of Documents, Ex. E to the Wong-Pan Decl., ¶ 7.

18

violence they caused – union chiefs did this.[83]

Gibson did not provide the County defendants with a copy of the newspaper article he was referring to, nor did he supplement his response with any additional information.

At Gibson's deposition on August 14, 2007, attorneys for the State defendants asked plaintiff to produce "any letters that you have sent to the Commissioner of the Office of Mental Health or to the commission on quality of care or to MHLS or anybody else about conditions at Mid-Hudson or about abuse at Hudson."[84] The County defendants joined the request.[85] Plaintiff did not produce any documents whatsoever in response to the request.

At his deposition, plaintiff initially testified that he had no communications with anyone from Orange County prior to March 8, 2003 concerning patient abuse at Mid-Hudson.[86] Gibson then changed his mind and testified that he had communicated with the Orange County District Attorney's Office and the State Attorney General's Office prior to March 8, 2003, when he

---

[83] Affidavit of Bennie Gibson in Support of Demand for Production, Ex. F to the Wong-Pan Decl., ¶ 7.

[84] Gibson Dep. at 107.

[85] *See id.*

[86] *See id.* at 181, 188.

19

sent a letter raising issues about his "abuse or arrest."[87]  According to Gibson, the

District Attorney's Office advised him to file a writ of habeas corpus.[88]

   Gibson also testified that he believes other Mid-Hudson patients have

written to the District Attorney's Office, including a patient I will refer to as

"TM."  Gibson does not know the contents of TM's letters, but TM informed

Gibson that he suspected that Mid-Hudson staff were stealing from him.[89]

Plaintiff testified that other Mid-Hudson patients have written to the District

Attorney's Office but he does not know the date or content of their letters.[90]

   During the course of Gibson's deposition, the County defendants

asked Gibson to produce all letters he wrote to the District Attorney's Office.[91]

The State defendants joined in the request.[92]  Although Gibson claimed that he had

copies of the letters he had written, he did not produce any documents in response

---

[87] *Id.* at 182.

[88] *See id.*

[89] *See id.* at 198-99.

[90] *See id.* at 199-200, 203-04.

[91] *See id.* at 185.

[92] *See id.*

to this demand.[93]

In addition to the Orange County District Attorney's Office, Gibson testified that he wrote twice to the Orange County Executive's Office some time after the March 8th incident.[94] He testified that the first letter was "about the problems that [he] was having in a criminal matter and the problems that [he] was having at Mid-Hudson with staff concerning, you know, some, I guess, retaliation for asking about an investigation for a beating of [himself] and testifying for another patient."[95] The second letter reasserted some of the issues brought up in the first letter.[96] Although Gibson testified that he retained a copy of at least one of these letters,[97] he did not produce any documents in response to the County defendants' discovery demands.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

---

[93] *See id.* at 186.

[94] *See id.* at 211-12.

[95] *Id.*

[96] *See id.* at 214.

[97] *See id.* at 212.

21

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[98] An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[99] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[100] "It is the movant's burden to show that no genuine factual dispute exists."[101]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[102] To do so, the non-moving party must do

---

[98] Fed. R. Civ. P. 56(c).

[99] *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

[100] *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[101] *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[102] *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the

22

more than show that there is "'some metaphysical doubt as to the material facts,'"[103] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[104] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[105]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[106] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court

---

nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

[103] *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[104] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[105] *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[106] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

on a motion for summary judgment.'"[107] Summary judgment is therefore "only

appropriate when there is no genuine issue as to any material fact, making

judgment appropriate as a matter of law."[108]

The submissions of a pro se party should be held "'to less stringent

standards than formal pleadings drafted by lawyers . . . .'"[109] District courts should

"read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the

strongest arguments that they suggest.'"[110] These same principles apply to briefs

and opposition papers submitted by pro se litigants.[111] Nonetheless, proceeding

pro se "does not otherwise relieve a litigant from the usual requirements of

summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence,

---

[107] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

[108] *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

[109] *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

[110] *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[111] *See Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003); *Burgos*, 14 F.3d at 790.

24

is not sufficient to overcome a motion for summary judgment."[112]

## B. Section 1983

To prevail on a section 1983 claim, a plaintiff must prove the

following four elements: (1) action taken under color of law; (2) deprivation of a

constitutional or statutory right; (3) causation; and (4) damages.[113] There are

additional requirements depending on whether the claim is against a person in his

individual capacity or against a municipality. With respect to claims against a

person in his individual capacity, a plaintiff must show "'that the defendant was

personally involved – that is, he directly participated – in the alleged constitutional

deprivations.'"[114]

Furthermore, a defendant may not be held liable for damages in a

section 1983 action simply because he or she held a supervisory or administrative

position.[115] Rather, an official's personal involvement in the alleged

---

[112] *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[113] *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 829 (1985).

[114] *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).

[115] *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) ("[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority.").

25

constitutional deprivation is a prerequisite to establishing liability.[116]

Personal involvement is established where:

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being
> informed of the violation . . . failed to remedy the wrong,
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant
> was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference . . . by failing to act on information
> indicating that unconstitutional acts were occurring.[117]

Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or

administrator' personal involvement.[118]

When a plaintiff brings a section 1983 claim against a municipality,

he must prove a fifth element – that an official policy of the municipality caused

---

[116] *See Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999).

[117] *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

[118] *See Chambers v. Wright*, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Mere receipt of letters or grievances or complaints . . . is insufficient to impute personal involvement to a supervisor.") (quotation marks and citation omitted). *See also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506-07 (S.D.N.Y. 2002) ("The general rule is that an allegation that an official ignored a . . . letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violation.") (quotation marks and citation omitted).

his constitutional injury.[119]  A municipality may not be found liable based on the vicarious liability theory of *respondeat superior*.[120]  Instead, a municipality may only be found liable under section 1983 if a plaintiff alleges that a "municipal policy of some nature caused a constitutional tort."[121]  In other words, a municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[122]  Moreover, a policy or practice cannot be shown by pointing to a single instance of unconstitutional conduct by an employee of the municipality.[123]

---

[119] *See Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). *Accord Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993) ("[A] municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury.").

[120] *Monell*, 436 U.S. at 691 ("[W]e conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original). *Accord City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).

[121] *Monell*, 436 U.S. at 691.

[122] *See Board of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 405 (1997).

[123] *See Tuttle*, 471 U.S. at 831 (Brennan, J., concurring in part and concurring in the judgment) (stating that "[t]o infer the existence of a city policy from the

Because vicarious liability is inconsistent with section 1983's

causation requirement,[124] "the 'official policy' requirement was intended to

distinguish acts of the municipality from acts of employees of the municipality,

and thereby make clear that municipal liability is limited to actions for which the

municipality is actually responsible."[125] The Supreme Court has emphasized that:

> [I]t is not enough for a § 1983 plaintiff merely to identify
> conduct properly attributable to the municipality. The
> plaintiff must also demonstrate that, through its deliberate
> conduct, the municipality was the "moving force" behind
> the injury alleged. That is, a plaintiff must show that the
> municipal action was taken with the requisite degree of
> culpability and must demonstrate a direct causal link
> between the municipal action and the deprivation of federal
> rights.[126]

In the absence of an established written policy of the municipality, a plaintiff must

prove that a certain practice of a municipality is so "persistent or widespread" as to

constitute "a custom or usage with the force of law," or that a practice or custom

---

isolated misconduct of a single, low-level officer, and then to hold the city liable
on the basis of that policy, would amount to permitting precisely the theory of
strict *respondeat superior* liability rejected in *Monell*.").

[124] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988).

[125] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). *See also
Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003) (explaining that plaintiff
must show that municipality is actually responsible for her injury).

[126] *Brown*, 520 U.S. at 404.

28

of subordinate employees was "so manifest as to imply the constructive acquiescence of senior policy-making officials."[127]

## III. DISCUSSION

### A. Claims Against the State Defendants

#### 1. The Commissioner

There is no evidence that the Commissioner participated directly in the alleged assault, restraint, destruction of legal papers, or retaliation/harassment of plaintiff. Nor is there any evidence showing that the Commissioner knew of, or failed to remedy, any alleged wrongdoing. Gibson presents no evidence indicating that the Commissioner was ever informed of any alleged wrongdoing, but offers only the conclusory assertion that he called and wrote to the Commissioner.[128] Gibson's conclusory allegations that notice was given are insufficient to establish liability.[129] Even assuming, *arguendo*, that the Commissioner received letters or telephone calls from Gibson, mere notification of alleged wrongdoing does not establish personal involvement.[130] In addition,

---

[127] *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (quotation marks and citation omitted).

[128] *See* Gibson Dep. at 164-65.

[129] *See Coughlin*, 58 F.3d at 873.

[130] *See Chambers*, 2007 WL 4462181, at *3.

Gibson cannot show a failure to address an alleged wrong because all of his abuse claims were investigated in accordance with OMH and Mid-Hudson policies. As a result of these investigations, remedial measures were recommended and taken. For example, as a consequence of the investigation into the alleged destruction of legal papers, Mid-Hudson employees were counseled. And when Gibson complained about retaliation/harassment, he was immediately moved to another building at his request.

Furthermore, there is no evidence that the Commissioner created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of any such policy or custom. Indeed, there is evidence that the Commissioner adopted regulations affording the residents of OMH hospitals the right to be free from abuse or mistreatment and requiring hospitals to investigate allegations of abuse and take appropriate corrective action. The Commissioner has also adopted regulations and issued an OMH policy strictly limiting the use of restraint.

Similarly, there is no evidence that the Commissioner was grossly negligent in supervising subordinates who allegedly committed wrongful acts. The Commissioner, as the head of OMH, has general oversight responsibility for all OMH hospitals, but does not supervise OMH employees at Mid-Hudson or at

any other OMH hospital.[131]  In addition, there is no evidence showing that the

Commissioner knew that OMH employees were committing wrongful acts agaisnt

Gibson.  There also is no evidence that the Commissioner exhibited deliberate

indifference to plaintiff's rights by failing to act on information indicating that

unconstitutional acts were occurring.  There is nothing that indicates that the

Commissioner was aware that unconstitutional acts were occurring in violation of

plaintiff's rights, or that the Commissioner failed to act in remedying such

violations.

        In sum, Gibson has failed to set forth any evidence showing the

Commissioner's personal involvement in any of the ways described above.[132]

Accordingly, all claims against the Commissioner are dismissed.

### 2.  Holanchock

        There is no evidence that Holanchock directly participated in the

alleged assault, restraint, destruction of legal papers, or harassment/retaliation.

The alleged assault and restraint occurred in March 2003.  Yet Holanchock did not

become the Executive Director of Mid-Hudson until September 4, 2003.[133]

---

[131]  See Watson Aff. ¶¶ 2-3.

[132]  *See supra* Part II.B.

[133]  *See* Holanchock Aff. ¶ 2.

31

Because Holanchock did not become Executive Director until six months after the alleged assault and restraint, his lack of personal involvement with regard to these acts is indisputable.

Moreover, there is no evidence that Holanchock knew of the destruction of plaintiff's legal papers or the retaliation/harassment but failed to remedy these wrongs. In response to a memorandum Holanchock received from an MHLS attorney regarding the alleged retaliation/harassment,[134] Holanchock ordered an investigation by subordinates at Mid-Hudson. Referring an allegation of wrongdoing to subordinates for investigation constitutes a proper response by an administrator.[135]

Although the investigation into the destruction of legal papers was inconclusive because no perpetrator could be identified, staff members were still counseled to promptly report such incidents to a supervisor in the future. And although the investigation into the alleged retaliation/harassment was inconclusive, the remedy that plaintiff sought was immediately provided to him. Gibson was transferred to another unit in another building the day after he

---

[134] *See id.* ¶ 5.

[135] *See Candelaria v. Higley*, No.04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 18, 2008).

complained about the retaliation/harassment.

In addition, there is no evidence that Holanchock created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of any such policy or custom. Indeed, there is evidence that Mid-Hudson had a policy proscribing patient abuse and requiring that allegations of abuse be investigated. Gibson's complaints were investigated in accordance with that policy. Nor is there any evidence that Holanchock was grossly negligent in supervising any of the subordinates involved in the alleged destruction of Gibson's legal papers or in his alleged retaliation/harassment. Holanchock, as Executive Director, was responsible for the overall operation of Mid-Hudson. As such, he did not supervise SHTAs, nurses, unit chiefs, or psychiatrists who worked with patients on the wards.[136] Furthermore, plaintiff's allegations were investigated by subordinates, staff members were counseled, and in one case plaintiff promptly received the remedy he requested. Nor is there any evidence that Holanchock exhibited deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring. The alleged assault, which occurred before Holanchock arrived at Mid-Hudson, was investigated. The destruction of legal papers was investigated and staff members

---

[136] *See* Holanchock Aff. ¶ 3.

were counseled about the need to report such incidents. Gibson's claims of retaliation/harassment were investigated and he was immediately transferred to another building, which was the requested remedy.

Because there is no evidence indicating any personal involvement on Holanchok's part, all claims against him are dismissed.

### 3. Healy

There is no evidence that Healy directly participated in the alleged assault, restraint, destruction of legal papers, or retaliation/harassment against plaintiff. The alleged assault and restraint occurred in March 2003, and the alleged destruction of legal papers occurred in May or June 2004. Healy did not work at Mid-Hudson, however, until October 29, 2004, when she became the Director of Quality Management. Before then, she was not involved in the operation or management of Mid-Hudson in any way.[137]

Although the alleged retaliation/harassment occurred when Healy was Director of Quality Management, there is no evidence that she knew of this conduct but failed to remedy it. There is no evidence indicating that Healy received notice of the retaliation/harassment. In any event, the alleged

---

[137] *See* Affidavit of Peggi Healy in Support of the State Defendants' Motion for Partial Summary Judgment ¶ 3.

retaliation/harassment was investigated and plaintiff was transferred promptly to another building. Nor is there any evidence that Healy created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of any such policy or custom. Finally, there is no evidence that Healy was grossly negligent in supervising subordinates who committed wrongful acts or exhibited deliberate indifference to plaintiff's rights. Accordingly, all claims against Healy are hereby dismissed for lack of personal involvement.

### 4. Catizone and Dr. Bae

There is no evidence that Catizone or Dr. Bae were personally involved in any way in the alleged destruction of Gibson's legal papers or in his alleged retaliation/harassment. Gibson has failed to show that these defendants participated in, had any knowledge of, or received notice of these violations. The reports concerning these incidents do not indicate that Catizone or Dr. Bae were involved in any way.[138] And Gibson has not presented any evidence indicating that these defendants had any involvement in these incidents. Consequently, plaintiff's destruction of legal papers and retaliation/harassment claims are

---

[138] *See* 7/23/04 Damaged Property Investigation Report by Warren Skov, Ex. C to the Spuler Aff.; 5/5/05 Memorandum from Risk Management Specialist Andrew Crawford to Holanchock Regarding Allegation of Psychological Abuse, Ex. D to the Spuler Aff.

dismissed against Catizone and Dr. Bae.

## B. Claims Against the County Defendants

### 1. Failure to Establish a Policy or Practice

To defeat the County defendants motion for summary judgment,
plaintiff must establish that the County defendants received numerous complaints
of patient abuse at Mid-Hudson and had a consistent, pervasive policy or practice
of not responding to such complaints. The two entities that allegedly received
complaints from Gibson and other Mid-Hudson patients are the Orange County
Executive's Office ("County Executive") and the Orange County District
Attorney's Office ("District Attorney"). Thus, to substantiate a *Monell* claim
against the County defendants, plaintiff must offer some evidence that either the
County Executive or the District Attorney had a policy or practice of ignoring
complaints of abuse by Mid-Hudson patients.

#### i. County Executive

Plaintiff could defeat the County defendants' motion for summary
judgment by establishing that the County Executive received numerous complaints
of patient abuse at Mid-Hudson and that its failure to respond to such complaints
was so widespread and consistent that it constituted an official County policy.
Assuming that plaintiff's testimony that he wrote to the County Executive once or

36

twice is credible, he is still unable to make out a *Monell* action against the County defendants given the ambiguity of the content of the two letters.[139] Although he argues that the letters complained, in part, about the retaliation he suffered at Mid-Hudson, he has offered no specific information concerning the content of the letters.

Neither the Orange County Executive's secretary nor the Commissioner of the Orange County Department of Mental Health have seen any correspondence from Gibson to the County Executive.[140] Gibson thus relies exclusively on his own testimony with respect to the letters. Accordingly, a reasonable juror may well conclude that the letters were never actually sent. Even if these letters were sent, the County Executive's alleged failure to respond to two requests does not constitute a "persistent and widespread" municipal policy or practice. Despite written and verbal requests for copies of the letters allegedly sent to the County Executive, plaintiff failed to produce them. Given the lack of any other evidence establishing a policy or practice on the part of the County

---

[139] Gibson testified that part of the letters related to his pending criminal case and his concern that there was insufficient evidence concerning his alleged automobile vandalism. *See* Gibson Dep. at 213.

[140] See 5/19/08 Affidavit of Mary Henrici, confidential secretary to the County Executive; 5/19/08 Affidavit of Chris Ashman, Commissioner of the Orange County Department of Mental Health ("Ashman Aff.").

37

Executive, plaintiff cannot establish a *Monell* claim against the County defendants through the County Executive's alleged failure to respond to his two letters.

### ii. Orange County District Attorney's Office

Plaintiff alleged at his deposition that he and four other Mid-Hudson patients wrote letters to the District Attorney who failed to respond to their grievances. Plaintiff's contention is that the County defendants are liable under section 1983 for the District Attorney's failure to investigate these complaints and take action on them. However, there is no evidence that: the District Attorney received numerous complaints of patient abuse at Mid-Hudson; the District Attorney ignored those complaints; or the District Attorney's pattern of not responding was so "persistent and widespread" as to represent an official County policy.

During his deposition, plaintiff testified that TM, Debby LNU, Tina LNU and FNU Sullivan may have written to the District Attorney's office.[141] However, plaintiff was unable to produce any evidence that such letters existed. Gibson testified that he has not seen the letters, he does not have any direct information about the contents of the letters, does not know the date of the letters, and has no direct knowledge as to whether the letters were actually sent or

---

[141] *See* Gibson Dep. at 200.

38

received by the District Attorney. Furthermore, Gibson testified that he wrote to

the District Attorney twice, and asked the District Attorney to intervene and "ask

Mid-Hudson to stop doing certain things or they would investigate certain things,

because I was not the only person who was experiencing some problems up

there."[142]   Plaintiff gave no other details as to the content of this letter, and he

failed to produce copies of these letters in response to defendants' discovery

demands.

Given the lack of any specific information, the letters allegedly sent

by other Mid-Hudson patients, as well as those allegedly sent by Gibson, do not

support the claim that the District Attorney had a policy or practice of routinely

ignoring Mid-Hudson patient complaints. Accordingly, plaintiff cannot predicate

his *Monell* claim against the County defendants on the District Attorney's conduct.

### 2. Proximate Cause

Gibson is unable to establish a causal connection between the County

defendants' alleged policy or practice of ignoring patients' complaints of abuse at

Mid-Hudson, and the injuries he sustained on March 8, 2003.  The Second Circuit

has stated that a plaintiff bringing a section 1983 action must prove that the

municipal policy or practice in question  was causally related to the injuries or

---

[142] *Id.* at 185-86.

damages sustained.[143]

All of the letters Gibson claimed to have sent to the County Executive were sent after this lawsuit was commenced, which was after the March 8th incident had occurred. The letters Gibson sent to the District Attorney was also after the March 8th incident.[144] Therefore, there can be no causal connection between the injuries plaintiff sustained on March 8, 2003, and the response, or lack of response, by the County Executive or the District Attorney to the letters sent by Gibson. Because plaintiff has failed to establish a causal link between the injuries he suffered and any municipal policy or practice on the part of the County defendants, his section 1983 claim against the County defendants must be dismissed.

### 3. Prosecutorial Discretion/Duty to Protect

#### i. Prosecutorial Discretion

Plaintiff is alleging, in part, that the County defendants violated his civil rights when the District Attorney failed to take action on the complaints of

---

[143] *See Barnes v. Anderson*, 202 F.3d 150, 158-59 (2d Cir. 1999).

[144] Although Gibson alleges that four other patients may have sent letters to the District Attorney, he did not provide any reliable details about the date the letters were sent or the contents of any of the letters. Without these specifics, these letters do not support a finding of causation.

abuse he received from Mid-Hudson patients. Plaintiff testified at his deposition that, apart from the two letters he claims to have sent to the County Executive, those complaints were sent to the District Attorney.

The District Attorney, however, has no legal obligation to take action on any complaint he receives. Once the District Attorney receives a complaint alleging a violation of state penal laws, he has the discretion to determine whether or not to initiate a prosecution and is entitled to absolute immunity for this decision.[145] Furthermore, when making a determination about whether to prosecute violations of state penal laws, the District Attorney is acting on behalf of the State of New York, not the County where he resides.[146] Given his prosecutorial immunity, an aggrieved plaintiff is unable to sue the District Attorney based on his decision to forego initiating a particular prosecution or investigation.

---

[145] *See Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) ("[T]his immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty."); *Smith v. Gribetz*, 958 F. Supp. 145, 150 (S.D.N.Y. 1997) ("The Second Circuit has defined prosecutorial immunity from section 1983 liability as covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'") (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)).

[146] *See Myers v. County of Orange*, 157 F.3d 66, 77 (2d Cir. 1998).

41

## ii.     Duty to Protect

To recover damages under section 1983, Gibson cannot simply allege

that the County defendants had a policy or practice of failing to respond to

complaints of abuse by Mid-Hudson patients.  He must also demonstrate that he

was deprived of his constitutional rights pursuant to this policy, practice or

custom.  Here, however, the County defendants had no legal obligation to protect

plaintiff from abuse at Mid-Hudson.

Mid-Hudson is a state-operated facility for the mentally ill, and is

overseen by the New York State Commissioner of Mental Health.[147]   The County

has no oversight authority over Mid-Hudson.  As stated by the Commissioner of

the Orange County Department of Mental Health:

> Although the Orange County Department of Mental Health
> offers certain services for individuals with a mental illness,
> it has no oversight responsibility over the State-operated
> Mid-Hudson Psychiatric Center.  The County of Orange
> does not oversee, monitor, supervise or provide any
> staffing for this facility.   The County of Orange also has
> no authority to initiate an independent investigation of that
> facility.[148]

---

[147] *See* Mental Hygiene Law § 7.17; *Makas v. Holanchock*, No. 02-cv-00836,
2007 WL 1651830, at *3 n.11 (N.D.N.Y. June 7, 2007).

[148] Ashman Aff. ¶ 3.

The County defendants cannot be sued for the failure to assert oversight authority that it does not have.

Nor has plaintiff established the existence of a "special relationship" with the County defendants that would require them to protect plaintiff from abuse. Plaintiff was not under the County's custody and control, and no affirmative duty had been created between the County and Plaintiff.[149] Thus, the County defendants were not legally obligated to protect plaintiff from abuse while he resided at Mid-Hudson.

For all of the reasons stated above – failure to establish a municipal policy or practice; lack of causation; prosecutorial discretion; and lack of duty to protect – the claims against the County defendants are hereby dismissed.

## IV. CONCLUSION

For the foregoing reasons, the State defendants' motion for partial summary judgment and the County defendants' motion for summary judgment are granted. A conference is scheduled for September 26, 2008, at 4:00 p.m., in Courtroom 15C. The Clerk of the Court is directed to close these motions (Documents # 94 and 106). Because some of plaintiff's claims have survived, it is

---

[149] *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (Due Process clause confers "no affirmative right to governmental aid" unless the government holds the individual in custody and against his will).

likely that this case will go to trial. In anticipation thereof, this Court's Pro Se

Office is directed to put plaintiff on the Court's pro bono list in the hope of

obtaining legal representation.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           September 17, 2008

## - Appearances -

**Plaintiff (Pro Se):**

Bennie Gibson
# 441-06-14241
Rikers Island
18-18 Hazen Street
East Elmhurst, NY 11415
(718) 546-0700

**For State Defendants:**

Michael E. Peeples
New York State Office of the Attorney General
120 Broadway
New York, NY 10271
(212) 416-8771

**For County Defendants:**

Laura Wong-Pan
Orange County Department of Law
255 Main Street
Goshen, NY 10924
(845) 291-3150